Paul WIMMER, Plaintiff–Appellant,

v.

SUFFOLK COUNTY POLICE DE-PARTMENT and Peter F. Cosgrove, Commissioner of Suffolk County Police Department, Defendants–Appellees,

Suffolk County, Defendant.

Docket No. 97–7321.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1997.

Decided May 5, 1999.

Traycee Ellen Klein, Dienst & Serrins, LLP, New York, NY, for Plaintiff–Appellant.

Christopher A. Nicolino, Assistant Suffolk County Attorney, Hauppauge, N.Y. (Robert J. Cimino, Suffolk County Attorney, Hauppauge, NY, of counsel, Theodore D. Sklar, James M. Catterson, on the brief), for Defendants–Appellees.

Before: MINER and PARKER, Circuit Judges, and DEARIE, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Paul Wimmer appeals from a judgment entered in the United States District Court for the Eastern District of New York (Wexler, *J.*) dismissing his claims for money damages against de-

---

* The Honorable Raymond J. Dearie, of the United States District Court for the Eastern District of New York, sitting by designation.

fendants-appellees Suffolk County Police Department (the "Police Department" or "Department") and Peter F. Cosgrove, Commissioner of the Department. Wimmer, who was a probationary police officer in the Department, alleged that he was terminated at the end of his probationary period because of his stance against racism in the Department and his political beliefs. Wimmer brought a claim of retaliation under 42 U.S.C. § 2000e–3(a) (1994) ("Title VII") and N.Y. Executive Law § 296(1)(e) (McKinney 1993),[1] and a claim under 42 U.S.C. § 1983 (1994) for deprivation of his rights under the First and Fourteenth Amendments. At trial, the district court granted judgment as a matter of law on the former claim at the end of Wimmer's case, reasoning that Wimmer had not presented any evidence that he was engaged in a "protected activity" under Title VII. With respect to the § 1983 claim, the court granted judgment as a matter of law at the end of the defendants' case, determining that Wimmer had not presented evidence that the Commissioner had established an actionable "policy" or "custom" or that he had acted to deprive Wimmer of his constitutional rights under § 1983.

For the reasons that follow, we affirm.

## BACKGROUND

After passing a civil service exam, Wimmer was appointed to serve as a probationary member of the Department in late March of 1993. Department procedures required Wimmer to undergo six months of training at the Suffolk County Police Department Academy (the "Academy"), followed by twelve weeks of field training.

Within the first few days of his attendance at the Academy, Wimmer submitted a self-introduction statement in accordance with Academy policy. In this statement, Wimmer described his "career expectation" as becoming a "Detective Lietenant

(sic), commanding officer of the Homicide Squad, perhaps making CAPTAIN." Wimmer expanded on his background and goals, writing,

> I am an ethicist, a lover of wisdom and justice. . . . I find myself respecting the rights of the accused whereas I "ALWAYS" treat "All" Persons with "equal" concern and respect. . . . I have recently been nominated Vice President of Humanity Against HATRED. . . . My legal mentor is Thurgood Marshall, and my Local hero is the Honorable Judge (retired) Stuart Namm for his courage to speak out on the injustices and collusion between the local police and prosecutors. I am a white male who respects and Admires All People.

Humanity against Hatred is an organization founded by New York City police officers and clergy to oppose bias and discrimination. Wimmer named Thurgood Marshall as a hero because, "up against insurmountable odds," Marshall "got a unanimous decision" to overturn "the most racist American legal doctrine, [separate] [b]ut [e]qual." Judge Namm, a retired Suffolk County judge, was named because "he spoke out against" the "many civil rights abuses by the Suffolk County Police Department [and] . . . the District Attorney [and] . . . unethical police conduct in general."

Wimmer alleges that, following submission of his statement, he was "singled out" as a person who did not belong at the Academy. He recounts an episode in which he was called down to Academy headquarters and upbraided for the content of his self-introduction statement by several of his superiors. At this meeting, he was purportedly asked to resign.

Throughout his tenure at the Academy, Wimmer was required to write "internal correspondence" many times. The

---

**1.** Because New York courts follow federal law to adjudicate claims under the New York Human Rights Law, the state law claim and the Title VII claim are collectively discussed under the "Title VII" heading throughout the remainder of this opinion. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992).

"Form 42" correspondence was required in response to various violations of the disciplinary code committed by Wimmer. Wimmer attributes the disciplinary citations to a pattern of harassment by Academy instructors designed to force his resignation. Ultimately, Wimmer did not resign but instead graduated from the Academy in September of 1993. He graduated near the bottom of his class, with a final grade of 77.34—2.34 points above the minimum passing grade of 75.

After graduating from the Academy, Wimmer began field training. Typically, field training involves four phases of training ("Phases I, II, III, and IV," respectively) of three weeks each. Wimmer's training took place at two police precincts, the Fifth Precinct and the Sixth Precinct. During field training, a Field Training Officer ("FTO") rides with a probationary police officer ("PPO"), observes and evaluates the PPO, and instructs the PPO in proper police procedures. FTOs fill out Field Training Daily Observation Reports ("DORs") on a daily basis to report their observations of the PPO, and a patrol supervisor fills out "End of Phase" reports to summarize the PPO's performance at the end of each phase.

Wimmer performed the first two phases of his field training at the Fifth Precinct. Generally, during Phase I, his FTOs reported on the DORs that he performed most tasks at a "minimum acceptable" level, earning a four out of a possible seven on the rating scale. Occasionally, the FTOs reported a "superior" five or six rating in various "appearance and attitude" and "officer safety" categories. Wimmer also received an "unacceptable" three rating in some of the "use of radio" categories and occasionally in other categories. The End of Phase report is generally positive in its assessment of Wimmer's performance: "[PPO] Wimmer makes a good appearance and has a good attitude toward police work. He has for the most part demonstrated acceptable performance standards for a first phase [PPO]. His use

of the police radio is an area that he will need to improve as he progresses in field training."

Wimmer claims to have discussed his membership in Humanity Against Hatred with one of his FTOs, Officer Pitts, during Phase I. Apparently, Wimmer told Officer Pitts that the Mayor of New York City at the time, David Dinkins, was an honorary member of Humanity Against Hatred. In this conversation, Wimmer states that Pitts used a racial slur to refer to Dinkins, who is African–American.

During Phase II, Wimmer's ratings generally improved, although comments written by his FTOs noted several areas of deficiency. On the first day of Phase II, Wimmer's FTO, Officer Hodge, noted that "[PPO] should calm down somewhat in verbalizing what seems to be a paramount desire to achieve higher rank. While most cops would like to achieve rank we don't all speak of it as if nothing else existed on the job EXCEPT making rank." Wimmer's use of the radio had apparently improved only to a minimally acceptable level, and deficiencies were also noted in regard to report and memo book writing. Although Wimmer was criticized for his derogatory attitude toward the public and his unwillingness to accept criticism, several FTOs noted his positive attitude and enthusiasm for police work. In his End of Phase II report, the reviewing officer, Sergeant Brady, stated that "he will be an asset to the [Department]."

In the course of Phase II training, Wimmer claims to have been in a patrol car on two occasions when Officer Hodge, without probable cause, stopped a vehicle containing "minorities." Wimmer alleges he was dissuaded from asking questions about these and other incidents, and was told by Officer Hodge and another of his FTOs that he "alienate[d] cops" and "made [them] sick." He also claims to have heard racial slurs used on the police radio, which he reported to Lieutenant Williams at the Sixth Precinct.

Wimmer's field training moved to the Sixth Precinct for Phase III. On his first day of Phase III, Wimmer claims to have witnessed one of his FTOs from the Fifth Precinct speaking to Officer Ferrante, one of his FTOs at the Sixth Precinct. In Phase III, Wimmer's ratings on his DORs were generally lower than during Phases I or II. On his second day of Phase III, Officer Ferrante observed that Wimmer "appear[ed] to be far behind in field training." Ferrante noted deficiencies in report writing and radio operation and stated that Wimmer sometimes made inappropriate comments. Ferrante also criticized Wimmer for his lack of professionalism and inability to take charge of a situation. Although Officer Ferrante reported at one point that he "does not believe [Wimmer] should be a police officer," the End of Phase report, completed by Lieutenant Williams, was somewhat less harsh in its assessment: "[PPO's] evaluations are nearly entirely in the 'minimum acceptable' category. [PPO] says inappropriate remarks at times and has been counseled [in] reference [to] his tendancy (sic) to 'overtalk.' A marginal improvement in some categories, but will require extension of [FTO] training."

During Phase III, Wimmer reports that he began to be called a "liberal" and a "fruitcake" by Officer Ferrante and another officer in the Sixth Precinct. He claims that Officer Ferrante repeatedly used racial slurs and also claims to have discussed his membership in Humanity against Hatred with Ferrante.

Wimmer's FTO in Phase IV was once again Officer Ferrante. Wimmer's ratings in Phase IV deteriorated somewhat from Phase III. He began to have a larger number of "unacceptable" ratings and fewer "superior" ratings. For the first time, the rating of "Not Responding To Training" appeared on Wimmer's DORs. Ferrante again noted that Wimmer was having trouble taking charge of situations. He also criticized Wimmer for making inappropriate comments and for paying more attention to his outside activities than to police work.

Sometime before the end of Phase IV, it came to Wimmer's attention that Sergeant Brady in the Fifth Precinct had submitted a changed End of Phase report evaluating Wimmer for Phase II. This revised report was dated October 24, 1993, the last day of Wimmer's Phase II training and the same date as the original End of Phase report, although it was prepared later. In contrast to the mostly positive comments on the original End of Phase report for Phase II, the new report included the following comment:

> While PPO Wimmer shows enthusiasm for his job, he has difficulty relating to his Field Training Officers. It was reported to the undersigned that PPO Wimmer expresses a cynical attitude toward civilians. This, however, is not done in the presence of the civilians. These types of shortcomings were reported to me by three of PPO Wimmer's FTOs.

Sergeant Brady later explained that he had created the original End of Phase report based solely on the FTOs' comments on the DORs. The day after submitting the original report, however, Sergeant Brady was approached by one of Wimmer's Phase II FTOs, Officer Gormley, who offered more severe criticism of Wimmer than had been included in his DORs. After speaking with Wimmer's other Phase II FTOs, Sergeant Brady drafted internal correspondence to his superior, Inspector Raber, reflecting the new information.

The correspondence from Sergeant Brady traveled through the chain of command to the office of the Chief of Patrol. Apparently, the new information was also disseminated to the Sixth Precinct, because Sergeant Brady soon thereafter received a telephone call from Lieutenant Williams of the Sixth Precinct directing him to file a revised End of Phase report for Phase II. Sometime after Sergeant Brady submitted the revised End of Phase report, Captain

James Rhodes, who works in the Chief of Patrol's office, called Sergeant Brady to discuss the internal correspondence and the revised End of Phase report. After this conversation, Captain Rhodes discussed Wimmer's problems with Rhodes' superior, Deputy Chief of Patrol Russell Brown.

Deputy Chief Brown consulted with officers in the Sixth Precinct and resolved that Wimmer should undergo two additional cycles of field training and two additional days of instruction at the Academy. According to Deputy Chief Brown, the extension of training "was to give [Wimmer] the best opportunity to get the most out of our training to be a police officer. We were trying to salvage the officer, and it was my determination that we would do extra field training to that goal."

Thus, Wimmer began Phase V at the Sixth Precinct under the supervision of FTOs Frank Nolan and James Brierton. Wimmer claims that on the first day of Phase V, Officer Nolan told him that he could not give him good evaluations because FTO Ferrante had given him bad evaluations and Nolan would "be sued" if he gave Wimmer good ones. Wimmer's average numerical rating for most categories during Phase V was a "minimum acceptable" four, but he received "Not Responding to Training" ratings in report writing categories approximately one third of the time.[2] Some of the difficulties that Wimmer encountered during earlier phases of his training apparently continued. Officers Nolan and Brierton observed serious deficiencies in Wimmer's report writing skills and noted that Wimmer was overly talkative. The FTOs also observed that Wimmer sometimes made inappropriate remarks to the public and seemed occasionally to lose focus on his own police work, preferring to discuss other subjects such as his outside activities.

Wimmer's Phase VI FTO was once again Officer Nolan. His evaluations during Phase VI were generally worse than in Phase V, and Officer Nolan noted particular deficiencies in regard to Wimmer's knowledge of penal law and his report writing skills. Although Nolan noted some instances in which Wimmer performed exceptionally well, he once again criticized Wimmer for inappropriate comments and questioned Wimmer's ability to perform under pressure. These concerns, as well as Wimmer's inability to accept criticism and lack of improvement, led Officer Nolan to recommend that Wimmer's employment be terminated. In the End of Phase report, Lieutenant William Murphy summarized Wimmer's performance as follows:

> PPO Wimmer has an unacceptable number of low ratings and indications by his FTO that he has not been responding to training in [various] categories.... This documentation has been discussed with PPO Wimmer in the past and also with him at the end of this Phase. He has been advised that a determination will be made by the Police Commissioner as to his future with this Department, based on his performance during field training.

At the end of Phase VI, Lieutenant Murphy met with Wimmer to discuss his field training. Wimmer claims that, at this meeting, Murphy told him that the "stop hatred thing didn't go over well with one of my FTOs in particular .... it didn't go over with my liberal school teacher mentality, didn't go over well with people at headquarters." During this meeting, Captain Rhodes also met with Wimmer. Rhodes remarked that "what [he] read on paper and what [he] saw in person were totally different things," because he had expected Wimmer to be less intelligent.

After Phase VI, near the end of January of 1994, a meeting took place to discuss Wimmer's continued employment with the

---

2. Wimmer underwent two apparently uneventful days of remedial training at the Academy during Phase V. He claims that his training consisted solely of firearms safety and exercises in paragraph rearrangement.

Department. Among others present were Deputy Chief Brown, Captain Rhodes, Lieutenant Murphy, Lieutenant Williams, Sergeant Brady, FTO Hodge, FTO Gormley, and FTO Ferrante. At the meeting, Lieutenant Murphy commented that "the words Mr. Wimmer select[s] to express his thoughts tend[ ] to make others feel that he was liberal in his viewpoint." The portion of Wimmer's personal statement referring to Judge Namm was read aloud during the meeting.

After the meeting, Deputy Chief Brown directed those present to prepare internal correspondence reflecting their impressions of Wimmer. The reports from his FTOs recited familiar themes, focusing on the deficiencies in Wimmer's report writing skills, his inappropriate comments, inability to take criticism, and "obsequious" courting of higher rank.[3] Captain Rhodes drafted a report to Deputy Chief Brown, summarizing Wimmer's field training and recommending termination. This report worked its way up the chain of command to Chief of Patrol Edwin Michel. In his memorandum accompanying the report, Deputy Chief Brown noted that "[a]lthough there are no single deficiencies or incidents of significant magnitude sufficient to warrant [Wimmer's] dismissal, collectively, there are overwhelming deficiencies and character flaws which preclude the probability that he will ever become a well-adjusted and productive police officer."

One week later, Chief Michel forwarded Deputy Chief Brown's report with a packet of supplemental materials to Chief of Department Joseph L. Monteith. Michel wrote that he "ha[d] reviewed these reports and concur[s] with Chief Brown's recommendation." Three days after receiving the report, Chief Monteith forwarded the packet to Commissioner Peter F. Cosgrove. Chief Monteith noted that "[a] quick read of his evaluation reports shows that only good things were said

about him until Oct. 24th when Sgt. Brady notes '[c]ynical towards civilians and has difficulty relating to FTOs' (This was not previously noted by a FTO). After Sgts. notified, he cannot ever do anything right." The packet of materials contained Deputy Chief Brown's memorandum, the DORs, and other internal correspondence, and might have contained Wimmer's Academy record. Commissioner Cosgrove later testified that he could not recall whether a copy of Wimmer's self-introduction statement was included in the packet.

Commissioner Cosgrove referred the packet to Deputy Commissioner Robert Kearon, Cosgrove's legal advisor, for Kearon's opinion of whether there was a "problem with the pattern" and whether termination would present any legal problems. Kearon saw no problems, and Commissioner Cosgrove prepared a memorandum to the personnel bureau the next day directing it to "[p]repare [a] termination letter."

Wimmer received a letter from Commissioner Cosgrove, dated February 15, 1994, "to advise [him] that, as a result of unsatisfactory performance during [the] probationary period, his employment as a Police Officer with this Department is terminated." After his termination, Wimmer claims to have had two telephone conversations with Lieutenant Murphy in which Murphy said that Wimmer's "stop hatred thing started [him] off on the wrong foot with some of [his] FTOs." During these conversations, Murphy claims that Wimmer told him for the first time of the racist behavior of some officers in the Department.

On November 22, 1994, Wimmer initiated the present action in the United States District Court for the Eastern District of New York. He alleged that he was terminated (1) in retaliation for speaking out against racism in the Department, in violation of his rights under Title VII; and

---

**3.** Curiously, Officer Ferrante's report begins, "I am making this report for administrative purposes only and am not waiving my right to remain silent for any criminal investigation."

(2) for his political beliefs, in violation of 42 U.S.C. § 1983.

During discovery, Wimmer's counsel sought personnel records of certain Department officers, documentation of any civilian complaints against these officers for racially or ethnically biased behavior, and a list of Department employees who have complained of changes in the conditions of their employment for objecting to discriminatory behavior in the Department. After the Department objected, Wimmer's counsel sought the intervention of Magistrate Judge Arlene R. Lindsay to direct compliance. Magistrate Lindsay allowed *in camera* inspection of responsive personnel files and directed the Department to provide a list of employees who had been the subject of alleged discriminatory conduct. Wimmer sought review of the discovery order, but the district court upheld the Magistrate's rulings.

At trial, Wimmer presented five witnesses and also testified on his own behalf. He called Commissioner Cosgrove and Lieutenant Murphy as part of his case-in-chief. At the end of Wimmer's case, the defendants moved for judgment as a matter of law on all claims. After argument on the § 1983 claim, the district court reserved decision. With regard to the Title VII claim, the following colloquy ensued:

THE COURT: How about now on Title VII?

MR. SKLAR:[4] No protected activity, your Honor.

THE COURT: What do you say to that?

MS. KLEIN: Your Honor, the law makes quite clear that the question is whether or not the plaintiff in this case had a good faith belief that he was opposing discriminatory practices. Mr. Wimmer testified he believed he was opposing discriminatory practices.

After confirming that the only discriminatory practices that Wimmer opposed were practices relating to people not employed by the Department, the court dismissed the Title VII claim.

In their defense, the Department and Commissioner Cosgrove presented eight witnesses, including Wimmer's Academy supervisor, FTOs Gormley, Hodge, Connoly and Ferrante, Sergeant Brady, and Deputy Chief Brown. At the end of its presentation, but before the case was submitted to the jury, the Department renewed its motion for judgment as a matter of law on the § 1983 claim. Among other grounds for the motion, defense counsel noted that

[t]here's absolutely no connection to Commissioner Cosgrove. The two bad FTOs, Ferrante and Nolan, have never been connected to him. As a matter of fact, Judge, nobody has ever even proved that Commissioner Cosgrove was aware of any speech, whether it be protected or unprotected that Mr. Wimmer ever made.

Although Wimmer's counsel rebutted several of defense counsel's points, she made no argument respecting the Commissioner's lack of knowledge and the corresponding lack of a "policy" for § 1983 purposes.

The district court granted the defendants' motion. After noting that it is the Police Commissioner who creates policy in the Department, the district court acknowledged that "[s]imply going along with discretionary decisions made by one subordinate ... is not a delegation to them of the authority to make policy." The court found that "[t]here is no proof that the [C]ommissioner knew of what was going on [i]n the speech, [and therefore] there cannot be a policy making based upon speech." The district court emphasized that there was no requirement that the Commissioner investigate, and that the action was brought strictly on policy and not against any police officer individually. Finding no nexus between the arguably objectionable conduct of individual officers

---

4. Mr. Sklar represented the defendants at trial and Ms. Klein represented Wimmer.

134

and the Commissioner, the district court dismissed the § 1983 claim.

On February 20, 1997, the district court entered judgment in favor of the Suffolk County Police Department and Commissioner Cosgrove. This appeal followed.

## DISCUSSION

On appeal, Wimmer contends that the district court erred both substantively and procedurally in granting judgment as a matter of law to the defendants on his Title VII claim and on his § 1983 claim. We disagree.

■ Rule 50 of the Federal Rules of Civil Procedure allows a defendant, at any time before the case has been submitted to the jury, to move for judgment as a matter of law. The court may grant the motion if the non-moving party has failed to adduce a "legally sufficient evidentiary basis" to support his claim. Fed.R.Civ.P. 50(a); *Piesco v. Koch,* 12 F.3d 332, 340 (2d Cir. 1993). Thus, a district court may grant a motion for judgment as a matter of law where there is such a complete absence of evidence that no reasonable juror could find in favor of the non-moving party. *See Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993). In evaluating the merits of the motion, "the court must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 203 (2d Cir.1998) (quotation omitted). We apply the same standard for judgment as a matter of law as the district court. *See Eagleston v. Guido,* 41 F.3d 865, 875 (2d Cir. 1994).

### I. Title VII Claim

Section 704 of Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).

Section 703(a) defines an "unlawful employment practice" as follows:

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e–2(a)(1).

■ The district court's grant of judgment as a matter of law on the Title VII claim at the close of Wimmer's case was based on its determination that Wimmer had presented insufficient evidence to establish a prima facie case of retaliation. "To establish a prima facie case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995)). To establish the first of these elements—participation in a protected activity—Wimmer need not prove that the conditions against which he protested actually amounted to a violation of Title VII. *See id.* (citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). Rather, Wimmer must demonstrate only that he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan,* 842 F.2d at 593 (quotation omitted).

■ We agree with the district court that Wimmer failed to establish that he was engaged in a protected activity. Wimmer's theory of recovery is that he was given poor evaluations and eventually terminated for having reported overhearing racial slurs made by police officers against black citizens and perhaps for questioning

Officer Hodge's two stops of minority (Hispanic) motorists without cause. There is no claim that any of this activity was directed at Wimmer or any of his co-employees. The precise issue presented, whether a complaint of retaliation for opposing discrimination by co-employees against non-employees is cognizable under Title VII, is one of first impression in this Circuit. Several other circuits, however, have addressed analogous circumstances.

The case most closely on point is *Crowley v. Prince George's County*, 890 F.2d 683 (4th Cir.1989). In *Crowley*, a white male sued his former employer, the Prince George's County, Maryland police department, for retaliation under Title VII. *See id.* at 685. He claimed that his salary was downgraded for drawing attention to racial harassment in the police department. *See id.* At trial, the jury returned a verdict in favor of the plaintiff, and the defendants appealed after the district court denied their motion for judgment notwithstanding the verdict. *See id.* On appeal, the Fourth Circuit reversed. *See id.* at 687. The court held that the plaintiff's theory, that he had been retaliated against for "investigating instances of racial harassment perpetrated by police officers against members of the community," was not cognizable under Title VII. *Id.* The court's reasoning is equally applicable to the case presently before us:

> It may be that the downgrading of [plaintiff's] position by the chief of police was wrongful or even spiteful. We have emphasized, however, that Title VII "is not a general 'bad acts' statute." Rather, the conduct it prohibits is specifically set forth.... While Congress may decide to extend the statute's coverage to persons who bring any discriminatory practice of an employer to light, such a step lies beyond the province of the courts. To find in Title VII protection for whistle-blowers on each and every instance of discrimination on the part of an employer is more than we think the

plain language of its provisions will support.

*Id.* (quotation omitted); *see also Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir.1997); *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978) ("[N]ot every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.").

In the case at bar, as in *Crowley*, Wimmer presented evidence that certain members of the Department had acted in a discriminatory manner toward the public. He offered no evidence, however, that there was unlawful discrimination with respect to the terms and conditions of employment within the Department. In fact, Wimmer testified that he never heard a racial epithet directed toward himself or any other member of the Department during his employment. In the absence of such evidence, Wimmer's claim of retaliation is not cognizable under Title VII because his opposition was not directed at an unlawful *employment practice* of his employer. *See Little*, 103 F.3d at 959–60; *Silver*, 586 F.2d at 141 ("The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the eradication of discrimination by employers against employees.").

Wimmer presents two arguments in an attempt to avoid this conclusion. First, he points out, correctly, that the racist activities within the Department need not actually have been violative of Title VII, as long as he had "a 'good faith, reasonable belief' that the underlying practice was unlawful." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (quoting *Manoharan*, 842 F.2d at 593). We have previously applied this rule to find that a plaintiff may state a prima facie case for retaliation even when her primary claim for discrimination is insufficient to survive summary judgment. *See, e.g., Quinn*, 159

F.3d at 768–69. In the present case, however, Wimmer could not have reasonably believed that he was opposing an employment practice because the evidence does not address racial discrimination in an employment practice. *See Manoharan*, 842 F.2d at 594 (holding that plaintiff could not have held a reasonable belief where he "neither pointed out discrimination against particular individuals nor discriminatory practices by [the employer]").

■ Second, Wimmer briefly claims that his actions opposed the "unlawful employment practice" of a "racially hostile work environment." We have previously recognized that a racially hostile work environment may constitute an unlawful employment practice under Title VII. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir.1997). It is inherent in the definition of a racially hostile work environment, however, that the person against whom the hostility is directed must be in an employment relationship with the employer. *See Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir.1998) (rejecting retaliation claim of a white woman where she alleged she was fired for opposing racist practices in an employment agency generally but did not allege that she "was retaliated against for sticking up for the rights of black co-workers or clients"). Because Wimmer did not introduce evidence that minority employees of the Department felt that they worked in a racially hostile environment, Wimmer could not reasonably have believed that he was protesting an unlawful hostile work environment.[5]

■ Wimmer also raises a procedural objection to the district court's grant of judgment as a matter of law. He argues that defendants' motion, which specified "no protected activity" as its ground, was inconsistent with the specificity requirement of Rule 50(a)(2). This argument has no merit. "[T]he purpose of requiring the

moving party to articulate the ground on which [judgment as a matter of law] is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir.1998) (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir.1986)). At a minimum, the judgment as a matter of law motion must "identify the specific element that the defendant contends is insufficiently supported." *Id.*

The defense motion clearly stated that Wimmer had failed to satisfy the first element of a prima facie case of retaliation. When viewed in the context of the entire colloquy, *see Gordon v. County of Rockland*, 110 F.3d 886, 887 & n. 2 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 74, 139 L.Ed.2d 34 (1997), it is apparent that Wimmer's counsel was alert to the alleged deficiencies in the case. Moreover, as Wimmer concedes in his brief, defense counsel moved for summary judgment on the same ground, giving Wimmer ample opportunity to present proof on the deficient element.

## II. Section 1983 Claim

The district court granted judgment as a matter of law for the defendants on Wimmer's § 1983 claim because Wimmer failed to present evidence that the alleged deprivations of Wimmer's constitutional rights were the result of a Department policy or that the Commissioner had knowledge of the alleged deprivations. We agree and affirm on this ground.

■ Section 1983 permits an individual deprived of a federal right by a person acting under color of state law to seek compensation in federal court. *See Richardson v. McKnight*, 521 U.S. 399, 403, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). To prevail on a § 1983 claim, a

---

**5.** Even if Wimmer had presented such evidence, it is not clear that he would have standing to bring a Title VII hostile work environment claim. *See Bermudez*, 138 F.3d at 1180.

plaintiff must prove that the challenged conduct was attributable at least in part to a person acting under color of state law, and that the conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. *See Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993).

When seeking to impose liability on a municipality, as Wimmer does in this case, the plaintiff must prove that a municipal "policy" or "custom" caused the deprivation. *See Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992). Rather, actions by an official "whose edicts or acts may fairly be said to represent official policy" may expose the municipality to liability under § 1983. *Monell*, 436 U.S. at 694.

Even assuming that the actions of Commissioner Cosgrove were those of a policymaker,[6] Wimmer's claim against the municipality fails nonetheless. Wimmer did not introduce evidence that the Commissioner had established a policy or custom, in a broad sense, of terminating probationary officers for their political beliefs or even of fostering an environment conducive to such actions. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)

(stating that the "policy or custom" requirement means, at least, that some wrongdoing must be ascribed to municipal policymakers). And, although a single decision by a municipal policymaker may suffice to establish a "policy" or "custom" in some cases, *see Pembaur*, 475 U.S. at 480, the Commissioner's actions are not sufficient to establish an actionable "policy" or "custom" in Wimmer's individual case.

Wimmer argues that Cosgrove's acquiescence to the "unconstitutional retaliatory conduct of his subordinates" imposes liability on the municipality, even without proof that Commissioner Cosgrove terminated him for unlawful reasons. Although in some cases a supervisor's acquiescence to actions of his subordinates may amount to a "custom" or "policy," in such a case the subordinates' "discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco*, 971 F.2d at 871. Even if some of Wimmer's FTOs and supervising officers had an unlawful motive, this motive is not reflected in the documentation that reached the Commissioner. Rather, the DORs and End of Phase reports paint the picture of a trainee who had serious difficulty performing necessary elements of his job. The documentation reviewed by the Commissioner did not manifest any discriminatory practice of Cosgrove's subordinates.

As to the Commissioner in his personal capacity,[7] Wimmer would need to establish that he "directly participated in the violation [or that he] failed to remedy the violation after learning of it through a report or appeal." *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)). Wimmer fell short of proving that the Commissioner participated in the viola-

---

**6.** The parties did not dispute, and the district court accepted, that the Commissioner was a policymaker for the Suffolk County Police Department based on the Suffolk County Charter.

**7.** It is unclear from the complaint whether Wimmer intended to sue Commissioner Cosgrove in his personal capacity. Regardless, any such claim would fail for the reasons set forth in the text.

tion; indeed, there was no evidence that the Commissioner knew of Wimmer's statements regarding his organizational affiliation, heroes, or complaints about discrimination in the Department. The most favorable testimony that Wimmer's counsel could elicit from Commissioner Cosgrove was that Cosgrove "could not recall" whether Wimmer's self-introduction statement was included in the packet of materials he reviewed before making the decision to terminate Wimmer's employment. Cosgrove also testified, however, that he did not read the statement prior to making the decision and that he had not spoken with any of the officers who trained or supervised Wimmer. Based on the testimony at trial, no reasonable juror could have found that Commissioner Cosgrove terminated Wimmer based on unconstitutional motives.[8]

\*     \*     \*

As a final point of error, Wimmer argues that the Magistrate Judge's rulings on discovery erroneously limited his access to personnel files of Department officers. After *in camera* review, the Magistrate Judge ruled that the personnel files of the FTOs did not contain any information relevant to the case and directed their return to the Department. We hold that the Magistrate Judge did not abuse her discretion in so finding. Regardless of whether the files contained information on other discriminatory activities within the Department, they could not have contained information relevant to the dispositive issues in this case.

## CONCLUSION

In accordance with the foregoing, the judgment of the district court is affirmed.

---

8. Wimmer also raises an objection to the lack of specificity in the defendants' motion for judgment as a matter of law on the § 1983 claim. Defense counsel articulated several grounds for the motion in great detail at the end of the Wimmer's case, when the court deferred ruling on the motion. After the defense's presentation, defense counsel again argued the motion in great detail. Accordingly, Wimmer had adequate notice of the motion for judgment as a matter of law on his § 1983 claim.