**Barbara GHIRARDELLI, Plaintiff,**

v.

**MCAVEY SALES & SERVICE, INC., Defendant.**

**No. 02 Civ. 9223.**

United States District Court, S.D. New York.

Oct. 9, 2003.

**382**

Stephen Bergstein, Thornton, Bergstein & Ullrich, LLP, Chester, NY, for Plaintiff.

Kevin M. Doherty, Joel Greenwald & Associates, P.C., New City, NY, for Defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Barbara Ghiradelli ("Ghiradelli") brought this action against her former employer, McAvey Sales & Service, Inc. ("MSS"), alleging retaliation in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C.2000e *et seq* ("Title VII") and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296. Before the Court is MSS's motion for summary judgment (the "Motion") to dismiss the complaint in its entirety. For the reasons discussed below, the Motion is granted.

### I. *FACTS*

Until November 1999, Ghirardelli worked, while also attending college, for eighteen years as an Assistant Deli–Hot Foods Manager/Deli Clerk and Meat Wrapper at Big V Supermarkets ("Big V"). She received a college degree in Accounting in 1993. On November 27, 1999, Ghirardelli accepted an early retirement buyout from Big V and worked briefly afterwards as a census enumerator.

In December 2000, Ghirardelli was hired for a job as a meat wrapper at the Price Chopper supermarket in Middletown, New York ("Price Chopper"). She alleges that one of the Price Chopper butchers sexually harassed and verbally abused her in January 2001, subjecting her to a hostile work environment on account of her gender. The incident led management to transfer her to another store in a different town, and eventually resulted in Ghirardelli's resignation from Price Chopper. On November 29, 2001, Ghirardelli filed a lawsuit (the "Lawsuit") under Title VII and the NYHRL in this Court against Price Chopper alleging that Ghirardelli was subjected to a hostile work environment by her manager on account of her gender, that Price Chopper failed to remedy this issue, and that Price Chopper retaliated against Ghirardelli when she complained about the matter.

The instant lawsuit does not directly relate to that alleged incident. Instead, it concerns a job Ghirardelli accepted nearly

one year later. In November 2001, Ghirardelli submitted a resume and cover letter to apply for a job at MSS, a manufacturers representative agency that assists manufacturers in presenting and improving the sales of their products within Home Depot stores. Her application, sent directly to Timothy McAvey ("McAvey"), MSS's President of Operations, caught McAvey's attention, in particular because of the professional presentation and quality of Ghirardelli's cover letter. McAvey forwarded the application on to Joseph Barbara ("Barbara"), MSS's Vice President of Operations, and told him that he liked it.

Subsequently, in early December 2001, Ghirardelli met with Barbara to interview for a position at MSS as a setup administrative assistant. The responsibilities of the job for which Ghirardelli interviewed included, among other things, answering the company's phones, writing letters to customers and suppliers, and computer data entry. Although Ghirardelli had never worked in an office environment or with computers in a job setting, Barbara offered Ghirardelli the job after a follow-up interview on the phone, and she accepted.

Ghirardelli's first day on the job was Tuesday, December 11, 2001. According to MSS, Ghirardelli immediately demonstrated her inability to perform the tasks of her job. MSS alleges that she was unable to perform basic computer tasks or learn how to perform them after being trained. MSS further alleges that Ghirardelli could not operate the company's phone systems, disconnecting customers and suppliers, and spoke to both clients and colleagues on the phone in an informal and unprofessional manner. Ghirardelli, on the other hand, offers a different view of her first days on the job. She contends that she had no problems operating the computers, was told by Barbara that she was "coming along fine" and received no negative feedback.

After the end of her third day on the job, on the evening of December 13, 2001, Ghirardelli called Barbara on his cell phone to inform him of the Lawsuit. Both parties agree that Barbara's response to Ghirardelli's revelation was restrained, and he told Ghirardelli that the Lawsuit was of no concern to MSS.

The following day, Friday, December 14, 2001, McAvey invited Ghirardelli to lunch with Barbara and Ed Drybred ("Drybred"), MSS's controller. Until this point, McAvey had not had a significant opportunity to talk with Ghirardelli. MSS alleges that at the lunch, Ghirardelli dominated the conversation, avoided answering questions about her work performance, and admitted to taking several hours to write the cover letter and thank you letters she had sent to MSS during her job search phase, even though she had merely copied the letters from a form book. MSS also asserts that Ghirardelli talked about how she had exaggerated certain parts of her resume.

Ghirardelli's recollection of the luncheon differs. She contends that the topic of the letters came up when McAvey complimented her on their style and form, and she responded by telling McAvey that writing the letters had taken her a while and that she had relied on certain books with form letters in them. According to Ghirardelli, her intent was to demonstrate to McAvey that she had been so determined to get the job that she worked rigorously to perfect the letters. Ghirardelli denies the other allegations about her behavior.

MSS alleges that, following the lunch, McAvey decided to terminate Ghirardelli's employment on the grounds that her phone manner was unprofessional, that other employees were complaining about her lack of computer skills and that she

was unable to focus on McAvey's questions at lunch. Moreover, based on their lunch conversation, McAvey concluded that Ghirardelli had exaggerated the qualifications listed on her resume and had plagiarized the letters that had appeared so impressive in her application. Because of this combination of problems, McAvey instructed Barbara to fire Ghirardelli.

That Sunday, December 16, 2001, Barbara called Ghirardelli at home and told her she was being fired. According to Barbara, he told Ghirardelli that she had misled MSS on her application and resume by falsifying certain information and not providing other information. Ghirardelli, on the other hand, claims Barbara simply told her that she did not have the qualifications for the job and that MSS did not think she would be able to handle the future workload.

After her conversation with Barbara ended, Ghirardelli left a message for McAvey, who eventually returned her call on Tuesday, December 18, 2001. Ghirardelli avers that McAvey told her that she had been hired as a temporary worker, not a permanent employee, and thus was not being fired, but was simply no longer needed. Ghirardelli also claims that McAvey explained that he was concerned about the length of time it took Ghirardelli to write her cover and thank you letters. Finally, Ghirardelli alleges that she asked McAvey if her termination had anything to do with the conversation she had with Barbara the previous Thursday evening, and McAvey responded that it had nothing to do with any conversation she had with Barbara. Ghirardelli states that the conversation ended with her asking McAvey to return her personnel files. McAvey, while remembering that he had some type of conversation with Ghirardelli, alleges that they simply discussed returning her personnel files. On November 11, 2002, Ghirardelli filed the instant lawsuit.

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

A motion for summary judgment may be granted only if the court determines on the record before it that there is no genuine issue of material fact to be tried and that the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir.2000). The burden of showing that no factual dispute exists rests with the party seeking summary judgment. *See Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In examining the evidence on the record to assess whether a genuine issue of material fact exists, the court must resolve doubts and ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's role is to determine whether there are genuine issues of material fact that require a trial, and not to resolve such disputed matters. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986).

### B. *RETALIATION*

Title VII prohibits an employer from "discriminat[ing] against any of its employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). In the instant case, Ghirardelli alleges that MSS terminated her em-

ployment because she engaged in a protected activity, namely, filing the Lawsuit.

■ To prevail on a claim of retaliation under Title VII, a plaintiff must provide sufficient evidence to establish a prima facie case comprised of the following elements: (1) participation in a protected activity; (2) knowledge by the employer of the employee's protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 134 (2d Cir.1999).

■ Where the evidence of the alleged unlawful retaliation is only circumstantial, the sufficiency of a Title VII retaliation claim is assessed under the three-step burden-shifting inquiry enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must make out a prima facie case of retaliation. *See Cifra v. G.E. Co.,* 252 F.3d 205, 216 (2d Cir.2001). If the plaintiff does so, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the contested action. *See id.* If the defendant meets this burden, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reasons were merely a pretext for retaliation and that its conduct under the circumstances gives rise to an inference of unlawful discrimination. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Rikhy v. AMC Computer Corp.,* No. 01 Civ. 7007, 2003 WL 1618529, at *5 (S.D.N.Y. March 28, 2003). Nonetheless, through all steps of this assessment, the evidence the plaintiff presents in opposing summary judgment must be sufficient to demonstrate the discriminatory intent underlying defendant's action. *See St. Mary's Honor Center v.* *Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089) ("It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' ").

### 1. Prima Facie Case

There appears to be no disagreement between the parties that MSS's termination of Ghirardelli's employment constitutes an adverse employment action. With regard to the other three prongs of Ghirardelli's prima facie case, however, the parties present differing arguments that the Court proceeds to examine.

### a. Participation in a Protected Activity

■ MSS argues that Ghirardelli did not participate in a protected activity when she filed the Lawsuit because she has failed to demonstrate she had a reasonable, good-faith belief that her complaints to Price Chopper were made in opposition to actionable hostile environment sexual harassment. The Second Circuit has examined the scope of protected activities for Title VII retaliation claims, and has held that the employment practices opposed by a plaintiff need not have "actually amounted to a violation of Title VII." *Wimmer,* 176 F.3d at 134. Rather, as MSS has noted, the plaintiff must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* (citations omitted).

Over the course of several decisions, courts in this Circuit have carefully defined what a good faith, reasonable belief entails. When a plaintiff has alleged facts

that, even if taken as true, do not support a prima facie Title VII claim, the plaintiff did not have such a good faith belief. For example, in *Wimmer*, the plaintiff, a white male police officer in training, alleged that he was fired in retaliation for his complaints about the discriminatory practices of his fellow police officers against citizens. However, the Second Circuit found that the plaintiff could "not have reasonably believed that he was opposing an employment practice because the evidence [presented did] not address racial discrimination in an employment practice," and instead involved discrimination by co-employees against the general public. *Wimmer*, 176 F.3d at 136. Moreover, the court found that the plaintiff failed to demonstrate that minority employees of his employer "felt they worked in a racially hostile environment, [so the plaintiff] could not reasonably have believed that he was protesting an unlawful hostile work environment." *Id.* Thus, because the alleged protected activity did not fall under the protection of Title VII, the court could not find that the plaintiff had engaged in such activity with a good faith, reasonable belief that it was protected. *See also Kunzler v. Canon, USA, Inc.*, 257 F.Supp.2d 574, 581–82 (E.D.N.Y.2003) (finding that plaintiff-employee could not have reasonably believed he was opposing a discriminatory employment practice because evidence concerned sexual harassment by co-employee against a customer, not other employees); *Taneus v. Brookhaven Memorial Hosp. Medical Center*, 99 F.Supp.2d 262, 267 (E.D.N.Y.2000) (finding that plaintiff-employee could not have reasonably believed she was opposing a discriminatory employment practice because the practice of which she complained involved not a discriminatory practice aimed at her or other employees, but rather a medical guide containing allegedly discriminatory statements about certain patients).

These rulings comport with other Second Circuit cases in which the allegations, taken as true, did support a prima facie Title VII claim. For example, in *McMenemy v. City of Rochester*, the plaintiff, a firefighter and treasurer of his firefighter's union, alleged that a female secretary for the union reported a sexual assault and sexual harassment by the president of the union to the plaintiff. *See* 241 F.3d 279, 281 (2d Cir.2001). The plaintiff investigated the secretary's claims, and alleged that as a result of his investigation, he was denied a promotion by the fire department. The Second Circuit found that, even though it had dismissed the secretary's Title VII claim in a separate proceeding, her claim contained "nonfrivolous arguments" that, under the circumstances, persuaded the Court that the plaintiff's belief that the alleged sexual harassment violated Title VII was reasonable. *Id.* at 285.

In the instant case, Ghirardelli alleged abusive behavior by a co-employee that Ghirardelli asserted was based upon her gender, a conclusion she reached because the alleged harasser supposedly did not treat male co-employees in a similar manner. While the Court does not have access to any evidence regarding the Lawsuit beyond the allegations in the complaint Ghirardelli filed in this Court and her NYHRL complaint, Ghirardelli's claims do not strike the Court on their face as being impossible to prove as sexual harassment under Title VII. They certainly seem to meet the modest threshold established by the Second Circuit for a plaintiff to demonstrate a good faith, reasonable belief that she is opposing a discriminatory practice, and therefore the Court is persuaded that Ghirardelli has satisfied the first element

of a prima facie case that she engaged in a protected activity.

Such a finding is bolstered by the plain language of Title VII, which, as the Second Circuit has noted, "prohibits discrimination by an employer against an employee who 'has opposed *any* practice made an unlawful employment practice' by Title VII or who has 'participated in *any* manner in an investigation, proceeding, or hearing' under Title VII." *McMenemy*, 241 F.3d at 283 (citing 42 U.S.C. § 2000e–3(a)) (emphasis added).[1] Indeed, the EEOC Compliance Manual even raises a hypothetical similar to the factual pattern here, noting that

> An individual is protected against retaliation for participation in employment discrimination proceedings even if those proceedings involved a different entity. For example, a violation would be found if a respondent refused to hire the charging party because it was aware that she filed an EEOC charge against her former employer.

EEOC Compliance Manual § 8–II(C)(4) (Dec. 5, 2000).[2]

■ The Second Circuit found this "interpretation persuasive because it is consistent with the plain language of Title VII," *McMenemy*, 241 F.3d at 284. This Court agrees. Indeed, protecting Ghirardelli in such a situation is consistent with a primary purpose of Title VII's retaliation clause: "Maintaining unfettered access to [Title VII's] statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Permitting employers to discriminate against an employee because of an employee's past use of Title VII's remedial mechanisms could significantly deter employees from engaging in such proceedings. *See McMenemy*, 241 F.3d at 284 ("We think that Title VII protects an employee from *any* employer, present or future, who retaliates against him because of his prior or ongoing opposition to an unlawful employment practice or participation in Title VII proceedings.") (emphasis in original).

■ Moreover, as the Second Circuit has observed, the fourth element of a retaliation claim, which examines whether a causal connection between the protected activity and the retaliation existed, gives a measure of protection to employers who are met with false claims that their acts are in retaliation for an employee's behavior with respect to another employer. *See id.* at 285. Finally, considering that Barbara allegedly knew the facts of the Lawsuit only as related by Ghirardelli, and Ghirardelli asserts that she characterized the Lawsuit to Barbara as one involving sexual harassment, it is reasonable to assume that, regardless of the merits of the Lawsuit, Barbara could have believed Ghirardelli's filing of the Lawsuit was a protected activity, and may have acted accordingly.

---

1. The Second Circuit also observed that "the NYHRL contains similar language prohibiting discrimination 'against any person because he or she has opposed *any* practices forbidden under this article or because he or she has filed a complaint, testified or assisted in *any* proceeding under this article.'" *McMenemy*, 241 F.3d at 283 (citing N.Y. Exec. Law § 296(1)(e)) (emphases added).

2. The Second Circuit has noted that while the EEOC's interpretation of Title VII in its agency manual may not warrant great deference because of the Supreme Court's recent decisions cautioning against such deference, the EEOC's interpretation is still "'entitled to respect' ... [because] an agency has a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *McMenemy*, 241 F.3d at 284 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

b. *Knowledge by the Employer of the Employee's Protected Activity*

■■ Contrary to MSS's claims, in order for Ghirardelli to prove the second element of a retaliation prima facie case—knowledge by the employer of the protected activity—she needs to show only that MSS had a general corporate knowledge that she engaged in protected activity. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116–17 (2d Cir.2000); *Donlon v. Group Health Inc.*, No. 00 Civ. 2190, 2001 WL 111220, at *3 (S.D.N.Y. Feb. 8, 2001). The Court is persuaded that, on the record presented, a reasonable jury could find that McAvey, who purportedly made the decision unilaterally to fire Ghirardelli, had knowledge of the Lawsuit before deciding to terminate Ghirardelli.

First, by informing Barbara, who served as the Vice President of Operations for MSS, of the Lawsuit, Ghirardelli was informing a senior official at the company who reported directly to McAvey, the head of MSS, and thus a reasonable jury could find there was sufficient evidence to support the conclusion that MSS had been put on notice that Ghirardelli had engaged in protected activity. *See Fowler v. New York Transit Authority,* No. 96 Civ. 6796, 2001 WL 83228, at *3 (S.D.N.Y. Jan. 31, 2001) (finding that when plaintiff informed a supervisor with a significant job position at defendant Transit Authority, plaintiff put defendant on notice that she had engaged in protected activity).

Second, the small size of MSS's management could lead a reasonable jury to infer that important information such as what Ghirardelli told Barbara would be shared with other top management officials like McAvey. *See Moree v. Frank H. Reis,* No. 00 Civ. 4632, 2001 WL 736810, at *8 (S.D.N.Y. June 25, 2001) ("The Reis Group is a closely-held company. As a result, a rationale [sic] finder of fact could reasonably conclude that the alleged knowledge of the company's management team members constitutes 'general corporate knowledge.' "). Indeed, the fact that McAvey ordered Barbara to conduct the termination without McAvey present could lead to a reasonable inference that, prior to the termination, the two men discussed issues regarding Ghirardelli's employment, which may have included the Lawsuit about which Ghirardelli had informed Barbara. Thus, the Court is persuaded that Ghirardelli has satisfied her burden with regard to the second prong of her prima facie case.

c. *Causal Connection Between the Protected Activity and the Adverse Employment Action*

■ As the Second Circuit and this Court have noted before, a plaintiff has a minimal burden in proving a prima facie case. *See Gallo v. Prudential Residential Services, Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir.1994) (noting that "plaintiff's burden of proof ... under the *McDonnell Douglas/Burdine* analysis is de minimis at this stage"); *Staff v. Pall Corp.*, 233 F.Supp.2d 516, 541 (S.D.N.Y.2002) ("[T]he burden at the prima facie stage is not an onerous one ..."). Consequently, proof of a casual connection between the protected activity and the adverse employment action has often been "established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (showing requisite connection "by, among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days."); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998) (holding that it was error to grant summary judgment dismissing the plaintiff's retaliation claim for

lack of evidence of a causal connection where her "discharge came less than two months after she filed a complaint with [defendant's] management and just ten days after she filed a complaint with the [state division of human rights]."); *Sprott v. Franco*, No. 94 Civ. 3818, 1997 WL 79813, at *11 (S.D.N.Y. Feb. 25, 1997) ("The short time frame—three days—between this protected activity and the adverse action is sufficient to establish a causal connection.").

Ghirardelli was fired three days after informing Barbara of the Lawsuit, a time period sufficiently short to create a reasonable inference of retaliation. Thus, the Court is persuaded that she meets her minimal burden in establishing a prima facie case of unlawful retaliation with respect to the loss of her job.

2. *Defendant's Legitimate Reasons for Terminating Ghirardelli*

 Once Ghirardelli establishes a prima facie case of retaliation, the burden shifts to MSS to rebut this presumption by offering a legitimate, non-discriminatory reason for terminating Ghirardelli. To satisfy this burden, MSS must produce admissible evidence sufficient to justify a judgment in its favor. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir.1994). "Any stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision." *See Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir.2000).

In the instant case, MSS contends that Ghirardelli was unable to perform the job she was hired for due to a lack of computer and professional skills, and that she admitted to exaggerating her qualifications and plagiarizing the cover and thank you letters she had sent in connection with her job application. The Court is persuaded that these reasons constitute legitimate business reasons to explain MSS's termination of Ghirardelli.

Ghirardell admitted that she had "no prior experience" in working as an administrative assistant before her job at MSS, and had "never worked in an office environment before." (Examination of Barbara Ghirardelli, attached as Exhibit A to Affirmation in Support of Defendant McAvey Sales' Motion for Summary Judgment, dated June 27, 2003 ("Aff."), at 47.) While her resume avers that she had technical skills with regard to five different Microsoft programs (Access, Word, PowerPoint, Excel and Publisher) as well as Windows 95, Ghirardelli admitted that, contrary to what her resume may have suggested, she was not proficient in Access, and had never used the other programs in any kind of job setting or at home. (*See id.* at 64.)

Indeed, Ghirardelli did not even own a computer at home, and the only computer experience she had prior to working at McAvey occurred during a five-month computer training class as well as at the Career Center for the Department of Labor, where she used a computer about thirty times over an eighteen-month period, and at a friend's house, where she had visited two to three times a year. (*See id.* at 65–68.) Based on this limited experience, and the fact that Ghirardelli had never actually used a computer in a job setting, it is not unreasonable to infer that MSS would have received several complaints about Ghirardelli's ability to function in the office. While Ghirardelli was promised training for her position, MSS had reason to expect her to possess certain basic office skills, and at minimum those skills she represented she had in order to be hired, in particular given MSS's small size and the consequent difficulty in focus-

ing its resources on educating Ghirardelli about fundamental computer and office tasks.

Ghirardelli's alleged unprofessional manner on the phone and her inability to use the phone system raises more of a contested issue, as Ghirardelli disputes these allegations. While other employees have offered sworn statements supporting McAvey and Barbara's observations of Ghirardelli's poor phone skills, this Court has observed in other Title VII cases that such testimony can be problematic because such co-workers are "still on the payroll or under the supervision or control of the accused employer or wrongdoer [and b]y reason of their dominant loyalties or biases, such persons may either be reluctant to get involved in a controversy against the company or to give an account of events that may contradict, embarrass or otherwise offend their supervisors. Thus, it is not unusual in these cases for defendants, in response to plaintiff's discrimination charge, to muster from among the ranks of their employees a uniform phalanx of opposition testimony and other evidence denying the victim's accusations or otherwise casting doubt on the veracity of her account." *Parrish v. Sollecito*, 253 F.Supp.2d 713, 716 (S.D.N.Y.2003). As a result, the Court disregards this aspect of Ghirardelli's alleged poor work performance.

MSS also asserts that Ghirardelli's behavior during the luncheon with McAvey, Barbara and Drybred was unprofessional and exposed problems with her resume. While the parties offer conflicting accounts of how Ghirardelli responded to questions and conducted herself during conversation, Ghirardelli admits that after McAvey told her he had been impressed by the cover letters she sent with her job application, she told him that it had taken some time for her to write the letters and that she had modeled her letters on samples from a book of form letters. (*See* Exh. A to Aff., at 122.) While the use of model letters on which to base one's own cover letter is not atypical in the business or legal worlds, McAvey had stated that the content and presentation of the letters were a key factor for him in noticing Ghirardelli's job application and considering her for the position.

Moreover, the composition of professional letters and similar correspondence was to be a significant part of Ghirardelli's job responsibilities. Indeed, given that Ghirardelli had no prior office experience, such letters were essentially the only possible office work product she could provide to MSS as a basis for its decision to hire her, as opposed to a more typical business or legal applicant who can provide, along with a cover letter, writing samples produced during school or previous employment. Thus, to be faced with the revelation that Ghirardelli's letters were not truly original compositions, and that it had taken her several hours to compose them despite such help, could be found by a rational jury—when considered along with the other issues raised about Ghirardelli's job performance—to create reasonable doubts in McAvey's mind regarding Ghirardelli's suitability for the job and her candor when applying for the position. Consequently, the Court is persuaded that MSS has articulated legitimate, non-discriminatory business reasons for Ghirardelli's termination.

### 3. *Ghirardelli's Explanation For Why MSS's Reasons Were Merely a Pretext For Retaliation*

 Once MSS offers its legitimate business reasons for discharging Ghirardelli, the burden then shifts to Ghirardelli to demonstrate that MSS's reasons were merely pretext for retaliation and that

MSS was in fact motivated by a discriminatory purpose. However, Ghirardelli offers no evidence of a discriminatory purpose other than her own conclusory statements and speculation. *See Rikhy*, 2003 WL 1618529, at \*5. Indeed, Ghirardelli and Barbara present consistent accounts of his reaction to her revelation that she had filed the Lawsuit—namely, that Barbara told Ghirardelli the matter was not his or MSS's concern. (*See* Exh. A to Aff., at 92–93; Deposition of Joseph Barbara, attached as Exh. C to Aff., at 48.) Ghirardelli even testified that after learning of the Lawsuit, and despite that awareness, Barbara reminded Ghirardelli that the office Christmas party was being held the following week and that she should not forget about it, a kind gesture that Ghirardelli said she appreciated and which hardly raises a reasonable inference that Barbara considered news of the Lawsuit to be a material issue that put Ghirardelli's employment in jeopardy.

Likewise, Ghirardell's account of her conversation with McAvey following her termination raises no genuine issue of fact that could lead a reasonable jury to conclude there was discriminatory animus behind the termination. When Ghirardelli explicitly asked McAvey if her termination had anything to do with the conversation she had with Barbara, McAvey, by Ghirardelli's own account, responded that it had nothing do with any conversation with Barbara. (*See* Exh. A to Aff., at 113.)

▮ Ghirardelli offers no other evidence on the record, such as testimony of a third party or written documents, that could lead to any sort of reasonable inference that McAvey, even if he knew about the Lawsuit, was motivated by its existence in deciding to discharge Ghirardelli. As a result, if this matter were to go to trial, a jury would be presented, on the one hand, with Ghirardelli's conclusory and un-substantiated allegations that the Lawsuit must have been a factor in her discharge, and, on the other hand, with Barbara and McAvey's sworn testimony that it was not. Such a conflict does not raise a genuine issue of material fact; rather, it pits sworn testimony against speculation, conjecture and self-serving conclusions. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."); *Lawton v. Alitalia–Linee Aeree Italiane–Societa*, No. 97 Civ. 4472, 1999 WL 632846, at \*5 (S.D.N.Y. Aug. 18, 1999) (ruling that "speculation [by plaintiff's attorney] cannot serve to contradict the sworn testimony of the witnesses. . . . Mere speculation and conjecture is not enough to create a genuine issue of material fact."). Thus, examining the record as a whole in light of the legitimate reasons MSS proffered for dismissing Ghirardelli, and even assuming Ghirardelli could establish the elements of a prima facie case of retaliation, a rational jury could not conclude that the grounds MSS articulated are false and merely a pretext for retaliation for protected activity. *See Gonzalez v. Beth Israel Medical Center*, 262 F.Supp.2d 342, 357–58 (S.D.N.Y.2003). Consequently, the Court is not persuaded that Ghirardelli has met her *McDonnell Douglas* burden.

## C. *STATE LAW CLAIMS*

▮ Discrimination claims brought under the NYHRL are analytically identical to claims brought under Title VII, and are therefore reviewed under the same standard. *See Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997) ("We have repeatedly noted that claims brought under the [NYHRL] are analytically identical to claims brought under Title VII."); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F.Supp.2d 477, 487 n. 3 (S.D.N.Y.1999) ("Retaliation

claims under the [NY]HRL ... are analytically identical to those under Title VII for the purpose of summary judgment."). Since Ghirardelli's federal claims of retaliation fail under the *McDonnell Douglas* framework, her state law claims are also dismissed.

## III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that Defendants' motion for summary judgment is granted.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**