Oswaldo BERMUDEZ, Bridgette Wilson, and Linda Schlichting, Plaintiffs–Appellants,

v.

TRC HOLDINGS, INCORPORATED, Defendant–Appellee.

No. 97–1459.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1997.

Decided March 13, 1998.

Thomas G. Halloran (argued), Halloran Law Office, Milwaukee, WI, for Plaintiffs–Appellants.

E. Vanessa Jones (argued), Barry L. Chaet, Beck, Chaet, Loomis, Molony & Bamberger, Milwaukee, WI, for Defendant–Appellee.

Before BAUER, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Three former employees of TRC Holdings, an umbrella corporation for affiliated employment agencies, believe that TRC violated their rights under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The district court granted summary judgment to TRC, which requires us to take the facts and plausible inferences in the light most favorable to the plaintiffs. Two of TRC's offices are involved: Trinity Employment Service ("Trinity") and Supplemental Staffing Services ("Supplemental").

■■■ Oswaldo Bermudez began at Trinity in March 1993 as an account executive. In May 1993 TRC moved him to Supplemental against his wishes—his base salary remained the same, but his commissions could be adversely affected by the fact that Supplemen-

tal was a struggling operation. TRC offered Bermudez an extra commission based on Supplemental's profits, but as it was losing money this was not altogether comforting. According to Robert Holton, TRC's president, Bermudez was transferred because he had managerial experience, and Supplemental desperately needed a good manager. Bermudez says that Holton told him a different story: Supplemental catered to minority employers (whatever that might mean), and Holton thought that it should be managed by minorities. Bermudez's Hispanic background qualified him for the post. That the only professional employee then at Supplemental was a black woman (Bridgette Wilson, who also is a plaintiff) gives some support to this story—as does a sentence in TRC's appellate brief: "Holton purchased [Supplemental] with the intent of starting an employment agency that could possibly be owned and managed by minorities". A plan to run a business specially designed to be "managed by minorities" is a plan to violate the civil rights laws—either the rights of minority workers assigned to the business against their will, or the rights of other workers excluded from those jobs. See *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The idea of a minority office catering to minority business, run by minority workers, is redolent of the days before Title VII. Fantastic as the possibility is, a jury could conclude that this is what happened—not only because of TRC's description (and Holton's statements to Bermudez) about Supplemental's role but also because in 1993 Trinity had no minority workers on its professional staff other than Bermudez, who was quickly moved to Supplemental. It is impossible to see how TRC can receive summary judgment on this record. Only a trial can determine who is telling the truth.

Bermudez complains not only about the transfer but also about his discharge in October 1993. During four months as Supplemental's manager, Bermudez brought in extra business, but not enough to make the office profitable. When the lease for Supplemental's suite expired at the end of September 1993, Holton transferred Bermudez and Wilson back to Trinity's office—Wilson to continue working as Supplemental's sole employee, and Bermudez to resume his post as an account executive for Trinity. According to Bermudez, however, his relations with Holton had soured because he had not turned Supplemental around and because he advised Wilson to complain about racial discrimination (as she did; more on this below). As Bermudez sees events, what followed was retaliatory: he received the same salary as before but without commissions; amenities (not to say necessities) of a salesman's job such as a desk and phone were gone; and two days after TRC learned that Bermudez had filed his own charge of discrimination he was suspended without pay. Six days later he was fired. TRC offers one reason for the discharge: Bermudez's refusal to sign a contract containing a no-competition clause. The district court accepted this as legitimate. Maybe so, but a trier of fact might see things otherwise. Balking at a contract does not explain the reduction in pay or the deprivation of tools essential to the job; nor does it explain why Bermudez was suspended as soon as TRC learned that he had filed a charge of discrimination, and fired (supposedly for failing to sign the contract) only later. The record shows that many other account executives signed the contract but does not establish that all did so, or what happened to those who tarried. Moreover, both TRC's demand and Bermudez's reluctance are perplexing, for Bermudez had signed essentially the same contract while at Supplemental. Because Supplemental was an office rather than a subsidiary, TRC *already* had the benefit of his contractual promises. A jury could well treat as a pretext for discrimination TRC's assertion that it fired Bermudez for failing to reaffirm promises he had already made.

■ Wilson might have made the same argument as Bermudez: that Holton exiled minorities to Supplemental, where they were doomed to fail. But instead of protesting her assignment, Wilson contends that TRC failed to give her formal training for the managerial position she occupied at Supplemental. What an odd contention. Wilson may have been *called* the "general manager", but she was also the entire professional staff; the only person she supervised was her secretary. (And the secretary, Holton's daughter,

was no ordinary employee.) When Bermudez arrived two months after Wilson did, she kept her highfalutin' title but became the managee. Between October 1993, when Supplemental was folded into Trinity's operation, and her discharge in December 1993, Wilson had no one to supervise. Nothing in this record suggests that TRC gave managerial training to any employee, of any race, sex, or national origin, who occupied the lowest rung on the professional ladder. Holton may have made promises he did not plan to keep, but Title VII does not transfer to federal court the enforcement of contracts.

■ This takes us to the end of Wilson's employment in December. Wilson contends that TRC cashiered her in retaliation for a charge of race and sex discrimination she had filed that August. She offers nothing to tie the events together, however. As the district judge pointed out, supervisors complained about Wilson's performance from the beginning of her work in March 1993. Targets for business generation went unmet. Wilson blames her shortcomings on lack of training, but we've been over that ground. She also treats Holton's vocal outbursts as support for the charge of retaliation, but she does not say that the quantity of angry words increased after August. Holton may well be an unpleasant person to work for, berating employees without much reason. Targets of his rancor appear to be selected without regard to race, however; Wilson tells us that Holton yelled at his own daughter too. *Post hoc ergo propter hoc* is not enough to support a finding of retaliation—if it were, every employee would file a charge just to get a little unemployment insurance. Timing may be an important clue to causation, see *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458 (7th Cir.1994), but does not eliminate the need to show causation—and Wilson really has nothing but the *post hoc ergo propter hoc* "argument" to stand on. See *Griffin v. Board of Regents*, 795 F.2d 1281, 1295 (7th Cir.1986).

■ Linda Schlichting, the third plaintiff, had a short and unhappy stint at Trinity. She was hired on August 2, 1993, and lasted less than three months. On October 22 Schlichting filed a charge of discrimination, contending that she was being subjected to a hostile work environment. She took medical leave on October 29 and never returned to work. The Social Security Administration later determined that Schlichting has been totally disabled (by agoraphobia) since that day. On December 7, after receiving a physician's report stating that Schlichting would be unavailable for an indefinite period, her supervisor sent a letter stating that her position would be filled by someone else, but adding: "If and when you are ready for return to work, please contact me." Schlichting has never offered to return to work. In February 1994 she filed a second charge of discrimination, this time contending that she had been discharged in retaliation for her first charge. Because Schlichting does not claim to be able to resume work even today, this contention is untenable, as the district court held. A charge of discrimination does not require an employer to keep a position vacant indefinitely for a person who may never be able to work. Cf. *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58 (7th Cir.1990). So even if Holton *wanted* to get rid of Schlichting in retaliation for her charge, he could not have succeeded; she was not available to sack. (Schlichting suggests that she need not establish causation, but this is nonsense.)

■ Let us consider, then, the possibility that Schlichting is entitled to damages for the three months she worked at TRC. Holton yelled at her, as he yelled at other workers, but this is not what the Supreme Court means by a "hostile work environment." Schlichting must establish that the employer created or condoned *discriminatory* conditions. Title VII does not require improvements in conditions that all workers experience. To recover she must show that on account of her race (she is white) or sex TRC made conditions miserable for "the purpose or effect of unreasonably interfering with [her] work performance or creating an intimidating, hostile, or offensive working environment". *Meritor Savings Bank, fsb v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Oncale v. Sundowner Offshore Services, Inc.*, —— U.S. ——, ——, 118 S.Ct. 998, 1001, —— L.Ed.2d ——, —— (1998).

■ According to Schlichting, whose story we must accept, fellow employees at Trinity either were biased themselves against blacks or tolerated clients' prejudices. Her first day on the job, a co-worker asked Schlichting to look through resumes in search of a "white sounding name" for placement with one client. When Schlichting notified the same co-worker that a client had a job for Trinity to fill, she would ask Schlichting whether the client would accept a black worker. A supervisor at Trinity bragged that she received flowers and candy from one of TRC's account executives because she accommodated his preference for placing only whites · with his clients. This person also shunned Wilson, the firm's only black professional employee, when Supplemental's operation was relocated to Trinity's premises. Schlichting didn't cotton to Holton's language. Holton described problems with a "black girl" (Wilson) at one of the branch offices and said that he didn't want to send his son to school in Minneapolis because the people there were "faggots" and that he was afraid his son would come home wearing dresses. Schlichting asserts that she always filled a client's order with the best qualified person, regardless of race or sex, and found it onerous to work among people who approached their jobs otherwise.

■ None of these words or deeds was directed against Schlichting. White ·women were welcome at TRC and fared well there. Perhaps TRC was violating the rights of persons who came to it seeking placement for employment, but Schlichting is not entitled ·to enforce their rights and does not claim that she was retaliated against for sticking up for the rights of black co-workers or clients. See 42 U.S.C. § 2000e–3. Her claim is not that white women were harassed on account of *their* race or sex, but that persons of any race or sex who were opposed to discrimination felt uncomfortable. We have never recognized this as a valid theory of discrimination under Title VII, and it is hard to see how it could be reconciled with the proposition that laws must be enforced by the victims (or by public prosecutors) rather than by third parties discomfited by the' violations. If unease on observing wrongs perpetrated against others were enough to support litigation, all doctrines of standing and justiciability would be out the window. Although mental distress may satisfy the actual-injury requirement of Article III, many prudential doctrines limit recovery to the persons whose injuries a statute is designed to avert. Consider for a moment the Federal Employers' Liability Act, another law that regulates conditions in the workplace. Suppose an employer, in the course of tortiously harming employee A, causes employee B (who observes the events) to suffer emotional distress. May B recover for this loss? *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 114 S.Ct. 2396, · 129 L.Ed.2d 427 (1994),· holds that B may not recover—that only persons who feel the direct impact of the employer's misdeeds may recover. Cf. *Metro–North Commuter R.R. v. Buckley*, —— U.S. ——, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). State tort law commonly imposes similar restrictions on persons who seek to recover on account of mental discomfort caused by misconduct toward third parties. See *Kuehn v. Childrens Hospital*, 119 F.3d 1296 (7th Cir.1997) (California and Wisconsin law).

Although the EEOC asserts that Title VII is different and that, for example, men may recover by demonstrating that the workplace is hostile toward women (and therefore toward persons who are sensitive to the feelings of women), see *EEOC Policy Guide on Employee Liability for Sexual Favoritism* (Jan. 12, 1990), in 8 F.E.P. Man. 405:6817, 6820, the Commission has not attempted to reconcile this· belief with the Supreme Court's approach to statutes such as the FELA. Doubtless there are some differences. See *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209–10, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972). For example, we held in *Stewart v. Hannon*, 675 F.2d 846, 850 (7th Cir.1982), that a white employee could be aggrieved by the lack of black employees in the workplace if that produced "the loss of important benefits from interracial associations", but this was a personal loss (which must be proved rather than just asserted, see *Patee v. Pacific Northwest Bell Telephone Co.*, 803 F.2d 476, 479 (9th Cir. 1986)). An adverse reaction to observing someone else's injury is a different matter. Cases such as *Warth v. Seldin*, 422 U.S. 490,

95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), show that *Trafficante* did not abolish all limits on third-party standing in civil rights cases. The fourth circuit recently divided evenly on the question whether the approach of cases such as *Stewart* translates to claims of derivative hostile working environments. *Childress v. Richmond*, 134 F.3d 1205 (4th Cir.1998) (en banc). We need not come to rest on the subject today, because we agree with the district court·that Schlichting has not made the necessary threshold showing that the comments she heard poisoned the working atmosphere.

■ No employer can purge the workplace of all comments that are offensive—or even of all comments that imply substantive violations of Title VII. See *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir.1986); *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir.1995). Vulgar, insensitive, and offensive comments do not amount to sex discrimination—for an unpleasant environment is *actionable* only if the hostility adds up to "discrimination" as Title VII uses that term. Schlichting complains about the comments and practices of two out of nine recruiters with whom she worked, and one of the account executives (the record does not show how many of these there were). None of the comments was directed against her personally. A reasonable person in Schlichting's position may have become angry or sorrowful on learning that people on Trinity's staff violated the legal rights of applicants in order to receive candy and flowers, but no reasonable jury could conclude that these comments made Schlichting a victim of sex discrimination. *Harris* rejects the option of treating as discriminatory "any conduct that is merely offensive". 510 U.S. at 21, 114 S.Ct. at 370. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Ibid.* Although the comments of which Schlichting complains reflect actionable discrimination against applicants for employment, a reasonable person in Schlichting's position would have found them "merely offensive", because they posed no threat to her

personally. The directly injured persons, rather than bystanders appalled to learn that discrimination is ongoing, are the proper plaintiffs in situations of this kind.

With respect to Bermudez the judgment is reversed, and his claim is remanded for trial. The judgment is affirmed with respect to Wilson and Schlichting.