Lamarr NORRIS, Plaintiff,

v.

CITY OF ANDERSON, Defendant.

No. 8:98–3450–13AK.

United States District Court,
D. South Carolina,
Anderson Division.

Jan. 20, 2000.

Suzanne Elizabeth Coe, Atlanta, GA, for Lamarr Norris, plaintiff.

Phillip Arthur Kilgore, Ogletree Deakins Nash Smoak and Stewart, Greenville, SC, Wade Edward Ballard, Edwards, Ballard, Bishop, Sturm, Clark & Keim, P.A., Spartanburg, SC, for Anderson, City of, defendant.

## ORDER

GEORGE ROSS ANDERSON, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment filed on June 27, 1999. Plaintiff brings five causes of action including breach of contract, breach of the covenant of good faith and fair dealing, violations of the South Carolina Whistleblower Act, S.C.Code Ann. § 8–27–10, *et seq.,* and violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and 42 U.S.C. § 1981.

In accordance with 28 U.S.C. § 638(b) and Local Rule 73.02, D.S.C., Defendant's Motion for Summary Judgment was re-

ferred to United States Magistrate Judge William C. Catoe for a Report and Recommendation. The Magistrate Judge issued a Report and Recommendation on December 23, 1999. The Magistrate Judge recommends that Defendant's Motion for Summary Judgment be granted as to Plaintiff's state law causes of action and Plaintiff's claims for failure to promote and retaliation in violation of Title VII and § 1981. The Magistrate Judge recommends that Defendant's Motion for Summary Judgement be denied as to Plaintiff's hostile work environment claim under Title VII and § 1981. Defendant timely filed objections to the Report and Recommendation.

■ The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight and the responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The Court must make a *de novo* determination of any portions of the Report of the Magistrate Judge to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

After a *de novo* review of the Report, objections, pleadings, affidavits, and exhibits of the record, the Court rejects the Report and Recommendation of the Magistrate Judge to the extent it recommends summary judgment be denied to Defendant on Plaintiff's hostile environment claim. The Court adopts the Report and Recommendation of the Magistrate Judge to the extent it recommends summary judgment be granted to Defendant on Plaintiff's state law causes of action and Plaintiff's claims for failure to promote and retaliation in violation of Title VII and § 1981. For the reasons set forth below, the Court grants summary judgment to Defendant on all claims.

## FACTS PRESENTED

Plaintiff Lamarr Norris is a black male who works for Defendant City of Anderson as a training corporal in the community patrol division. (Pl.Dep. at 8.)[1] Norris has worked for Defendant on three separate occasions, the first of which lasted eight years, beginning in April 1984.

Norris left the City sometime in 1991 to work for the Anderson County Sheriff's Department despite his Captain's pleas to the contrary. Norris's resignation letter states that his departure was due to personal reasons only. Norris worked at the Sheriff's Department only 80 days, at which time he returned to the City at the further behest of his Captain and superior officers. The City rehired Norris in the same position with the identical title, pay, seniority and benefits that he received prior to his first resignation. (Pl.Dep. at 12–13.)

Approximately two years later, Norris again voluntarily resigned his employment with the City. According to Norris, he left because of the low number of black officers at the Department, the substandard equipment he was required to use in doing his job, and being required to perform detective work without receiving detective pay. (Pl.Dep. at 16, 18.) Norris next worked for the City of Clemson as a patrolman. (Pl.Dep. at 34.) He voluntarily resigned this position approximately two years later. Defendant re-hired Norris a third time on July 18, 1995 as a patrolman. In February of 1998, Norris complained to the EEOC regarding an alleged racially hostile working environment. Thereafter, Norris applied for and was given a promotion to training corporal. (Pl.Dep. at 40.)

Norris claims that sometime during his first stint with the City, prior to 1991, he overheard Captain Horace Merritt saying

---

1. References to Plaintiff's Deposition will be styled as (Pl.Dep. at ___.)

that "as long as he was over investigations, he wouldn't have a black working there." (Pl.Dep. at 21.) This comment was made in Norris' presence (but not directed at him) over nine years ago. Norris complained to no one about Merritt's comment.

Norris alleges that around 1985 he was given a fake i.d. card which he considered racist and tore up. (Pl.Dep. at 144.) Norris neither reported nor complained to anyone about this incident. (Pl.Dep. at 144.) In the mid to late 1990's, a similar card was found in a file cabinet used by a former employee, but there was no indication that the card had been shown to any employee, including Norris.

Norris claims that Bo Gilreath, the Fire Chief in Anderson, called him "Dan" which Norris interpreted as an acronym for "dumb ass nigger." (Pl.Dep. at 55–56.) These remarks were allegedly first made in the late 1980's. Upon learning of Norris' complaint, the City Manager immediately spoke to the Fire Chief who apologized to Norris and promised to never use the term again. (McConnell Aff., ¶ 13.)

In 1992, Lieutenant Otis Green allegedly made a racial comment in Norris' presence at the firing range. (Pl.Dep. at 61.) This comment was not directed at Norris, and Norris neither filed a grievance nor complained to anyone about this incident. (Pl. Dep. at 58.)

Before Captain McMahan's retirement over two years ago, he allegedly made a single offensive comment to Norris that Norris interpreted as regarding the safety of African–Americans in McMahan's home town of Iva. (Pl.Dep. at 55–56.) Norris never complained to Defendant about this incident. (Pl.Dep. at 58.)

On one occasion Lt. Mitchell allegedly asked Norris to type some notes off of a piece of paper which had a Confederate flag hand-drawn in one corner. (Pl.Dep. at 146.) Norris insists that the flag offends him and that Mitchell "knew it," but he never told Mitchell that or reported his

perceptions of the flag to the City. (Pl.Dep. at 147.)

In 1997, a round of ammunition exploded in Norris' service revolver. Norris took the revolver to Lt. Green who inspected the weapon and told Norris that he could continue to use the weapon. Defendant sent Plaintiff's weapon to the manufacturer for an evaluation. The manufacturer returned the weapon having found no defects whatsoever and determining that the weapon was safe to use.

Lt. Green displayed a Confederate flag and a picture of Civil War general Robert E. Lee in his office. Norris admits not complaining to anyone about this situation during the six or seven years the Items were displayed. Lt. Green immediately removed both items when he learned that another employee had complained to Chief McConnell about them. (Green Aff., ¶ 4–5.)

Norris heard a rumor that Deanne Orr, a booking officer, called Officer Bracone a "nigger lover," yet Norris has no personal knowledge of this event. (Pl.Dep. at 63–64.) He also heard that Ms. Orr was disciplined for allegedly making this statement. (Pl.Dep. at 64.) Even though Ms. Orr vehemently denied making such a statement, she was in fact disciplined.

In August 1997, a racial slur was uttered on the Department's radio frequency during a chase of a black suspect. Norris heard a voice come over his police radio and say, "Get that nigger." (Pl.Dep. at 125.) This comment was not directed at Norris and was not made in his presence. Norris cannot identify the speaker. Norris claims that the City improperly investigated this incident, but he admits not having any personal knowledge as to how the City handled the incident. (Pl.Dep. at 126.) Norris admitted such investigations were difficult and that he did not expect the City would be able to find who made these remarks. (Pl.Dep. at 127.) Instead, he was interested in the investigation for its deterrent effect on potential future, similar behavior. (Pl.Dep. at 128, 134.)

Norris also claims that the City delayed beginning its investigation of this incident until after he and other officers complained about it. (Pl.Dep. at 128, 134.) In essence, Norris claims that "they don't investigate stuff involving minorities like they should. Like they do other people." (Pl.Dep. at 134.) However, he admits he can think of no examples of situations involving white officers which the City handled better. (Pl.Dep. at 136.)

It is uncontradicted that the City conducted an extensive three week investigation into the radio comment. The Department, through Captain Eidson, began an investigation of the incident immediately upon learning of it. (Eidson Aff., ¶ 4.) It is uncontradicted that Defendant sought assistance from County Communications Center Maintenance Shop, the Tenth Circuit Solicitor, and the United States Attorney for the District of South Carolina. (Eidson Aff., ¶¶ 3–16.) Captain Eidson also contacted the South Carolina Law Enforcement Division, the Federal Bureau of Investigation, and the Motorola Corporation to request their participation in the investigation. (Eidson Aff., ¶¶ 3–16.)

On October 27, 1998, Officer James Williams received a written threat that called Officer Williams a "nigger lover" and told him to expect "severe, deadly consequences" if he did not drop his complaint with the EEOC. The threat was neither made to Plaintiff nor did it reference him or his EEOC claim. The threat was made to Officer Williams, a Caucasian. The City immediately conducted an extensive investigation into the threat. On the day of the threat, Captain Eidson requested that Lieutenant Creamer notify the Federal Bureau of Investigation (FBI) because he felt it might be covered by the Federal Hate Crime Statute. (Eidson Aff., ¶ 2, Ex. 5.) The FBI was in fact so notified. (Eidson Aff., ¶¶ 17–18.) Furthermore, on October 29, 1998, merely two days after Williams received the threat, Captain Eidson contacted the South Carolina Law Enforcement Division (SLED)

seeking assistance. (Eidson Aff., ¶ 2, Ex. 4.) SLED conducted polygraph examinations of all officers and was unable to conclude any involvement by any of the City's officers.

Norris claims that officers of the department used the term "nigger" in conversation. However, the term had been used by both black and white officers and it has been three or four years since such a term had been used by a white officer to a black officer in a derogatory fashion. (Green Dep. at 22–23.) In fact, Captain Eidson warned officers that the City would reprimand them if they continued to use the word. (Eidson Dep. at 23.) Finally, Norris and several of his fellow officers formed the Coalition for Equality in October 1997. Norris claims that members of the group were "subjected to shunning, and unfair disciplinary actions," but he does not claim that he suffered such treatment personally.

### LAW AND ANALYSIS

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The role of the court in deciding a motion for summary judgment "is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. If Defendant carries its burden of

showing an absence of evidence to support a claim, Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548. In other words, Plaintiff "must present affirmative evidence in order to defeat a properly supported summary judgment motion. This is true even when the evidence is likely to be within Defendant's possession, as long as [Plaintiff] has a full opportunity to conduct discovery." *Cooper v. United States,* 903 F.Supp. 953, 955 (D.S.C.1995). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of Plaintiff's case necessarily renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. Moreover, production of a "mere scintilla of evidence" in support of an essential element will not prevent the granting of a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505. The Magistrate Judge determined that genuine issues of fact exist as to whether Plaintiff was subjected to a racially hostile work environment and whether Defendant could establish the affirmative defenses.

■ To establish a *prima facie* case for hostile environment racial harassment, the plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on his race, (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Hartsell v. Duplex Prod., Inc.,* 123 F.3d 766, 773 (4th Cir.1997); *Swentek v.*

*USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir. 1987). If the plaintiff successfully meets this initial burden, then the employer may still be successful if it proves that either the events did not take place, they were isolated or genuinely trivial, the employer took prompt remedial action reasonably calculated to end the harassment, or the employer was unaware of the harassment. *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir. 1983); *see also Dwyer v. Smith,* 867 F.2d 184, 187 (4th Cir.1989).

■ To make a hostile environment claim, the work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2282, 141 L.Ed.2d 662 (1998) (citing *Harris,* 510 U.S. at 21, 114 S.Ct. 367). If the plaintiff does not subjectively perceive the environment to be abusive, then the conduct has not actually altered the conditions of the plaintiff's employment and there is no Title VII violation. *Id.*

■ Not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To prove a hostile environment claim, a plaintiff must be able to show more than a mere utterance of an epithet which engenders offensive feelings in an employee, as this does not sufficiently affect conditions of employment to constitute actionable harassment. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. "An isolated racial remark, even though offensive and entirely inappropriate, does not establish an abusive working environment." *Williams v. Prince Georges County Hosp. Ctr.,* 932 F.Supp. 687, 689 (D.Md.1996), *aff'd* 103 F.3d 122 (4th Cir.1996); *see also Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2nd Cir.1986). "Title VII is not a federal guarantee of refinement and sophistication in the workplace." *Hartsell v. Duplex Prod.,*

*Inc.*, 123 F.3d 766, 773 (4th Cir.1997). In *Faragher*, the Supreme Court held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms or conditions of employment." 118 S.Ct. at 2283. Derogatory comments may constitute unlawful employment practices only when they occur at an excessive and opprobrious level. *Johnson v. Richmond County*, 507 F.Supp. 993, 996 (S.D.Ga.1981).

■ In determining whether harassment is sufficiently severe or pervasive as to constitute a "hostile" environment, the court must look at all the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely consists of offensive utterances; and (4) whether it unreasonably interferes with the employee's work performance. *Harris*, 114 S.Ct. at 371. These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Faragher*, 118 S.Ct. at 2275 (citing *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)). They are further meant to filter out complaints attacking "the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender related jokes, and occasional teasing." *Faragher*, 118 S.Ct. at 2284; *see also Bolden v. PRC, Inc.*, 62 FEP 1236, 1238–39 (D.Kan.1993), *aff'd.*, 43 F.3d 545 (10th Cir.1994), *cert. denied*, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995) (holding that racist jokes and epithets, including "no good nigger," were not so intolerable as to force an African–American employee to resign; the slurs and jokes

were not reported to management, and white workers also were the targets of jokes and derisive comments).

■■ Defendant objects to the Magistrate Judge's conclusion that issues of material fact remain on Plaintiff's hostile work environment claim as well as the Defendant's affirmative defense. The Court agrees and is compelled to grant summary judgment on this cause of action and the affirmative defenses.[2] The uncontradicted facts, giving Plaintiff the benefit of all proper inferences, do not rise to the level of hostile work environment race discrimination actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, *et seq.*, or 42 U.S.C. § 1981.

Plaintiff identified several examples of what he perceived to be racially offensive events that took place over a fourteen year period. Many of these events occurred outside the 300–day limitation period and/or were not directed toward Plaintiff personally. Most of these events were not reported to Defendant. Norris bases his claim of hostile environment discrimination on either incidents which are too remote in time to fall within the law's purview or on isolated instances which do not rise to the level of actionable harassment. Norris points to Captain Merritt's comment made during his first stint at the City from April 1984 until 1992. This was one isolated comment made in Norris' presence (but not directed at him) over nine years ago. Norris complained to no one about Merritt's comment. (Pl.Dep. at 21.) Norris complains about Captain McMahan's alleged reference to the safety of an African–American person in his home community. Again, this was an isolated comment

---

**2.** The Court also grants Defendant summary judgment on Plaintiff's hostile work environment claim brought pursuant to 42 U.S.C. § 1981 because Plaintiff cannot use § 1981 as a vehicle to recover for alleged race discrimination. As the Supreme Court held in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), when a suit is brought against a state actor, such as the City of Anderson, 42 U.S.C. § 1983 is the "exclusive federal remedy for a violation of the rights guaranteed in 1981." *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (quoting *Jett*, 491 U.S. at 733, 109 S.Ct. 2702). Therefore, Plaintiff's failure to plead a violation of § 1983 deprives this Court of subject matter jurisdiction over any claims Plaintiff may have under § 1981.

about which Norris never complained. (Pl.Dep. at 55–56.) Plaintiff complains that Bo Gilreath, someone not employed by the police department and who had no authority whatsoever over Plaintiff, called him what he considered to be a racially derogatory name. When Norris communicated this episode to the City, the city manager discussed the situation with Mr. Gilreath, who apologized and promised never to say it again. Similarly, he alleges that a citizen on the street once greeted him with a racially derogatory name about five years ago and that in 1992, Lt. Green allegedly made a racial comment in Plaintiff's presence, again not directed at Plaintiff. Plaintiff did not complain to anyone about any of these incidents. (Pl.Dep. at 61.) Each of these incidents was isolated and unrelated to other events. None were physically threatening or humiliating and none involved a direct confrontation, which is necessary to make such an isolated instances severe or pervasive. They were perhaps offensive utterances, but the law is not a general civility code guaranteeing refinement and sophistication and protecting each of us from the ordinary tribulations of the workplace.

■ This Court must also consider the social context in which the offensive comments were made. *Oncale,* 118 S.Ct. at 1002; *Weston v. Pennsylvania Dep't of Corrections,* 78 FEP Cases 454, 1998 WL 695352 (E.D.Pa.1998). The *Oncale* Court explained that the objective severity of alleged harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.[3] *Id.* (citing *Harris v. Forklift Sys.,* 510 U.S. at 23, 114 S.Ct. 367). In *Weston,* a prison guard sued his employer after suffering what he characterized as an assault and battery by a female co-worker who "touched [his] buttocks by placing her finger through a hole in the seat of [his] pants" and offensive comments and jokes concerning the incident by co-workers and his manager. *Weston,* 78 FEP Cases at

454–455. The court rejected Plaintiff's hostile work environment claims and, citing the 'social context' factor highlighted by *Oncale,* concluded that:

> [t]hese comments, jokes, and jibes fall easily into the category of simple teasing when considered in light of the social context of prison. It is difficult for the Court to imagine a more caustic environment, or one more likely to promote harsh or even acidic banter, than prison.... [Plaintiff] works with those regularly confronting the criminal population; the abrupt or insensitive demeanor of those whose duty it is to maintain order in prison and the stress borne out of daily conflict with the prison population pervades [his] working environment. These conditions almost necessarily must foster 'offensive comments, jokes, and jibes.'

*Id.* at 456, 1998 WL 695352.

The social context of police officers of the City of Anderson is analogous to that of *Weston's* prison guards. Both interact daily with members of society's criminal population and must adhere to a duty to maintain order despite a significant amount of daily conflict with actual or suspected criminals. Police officers regularly deal with an antagonistic work environment which promotes harsh or even acidic banter. Law enforcement officers outside of detention centers must face an even less structured work environment that is as or more stressful than that faced by prison guards.

Norris further alleges that Lt. Green displayed offensive materials in his office; however, he admits to not complaining to anyone about the situation. (Pl.Dep. at 79–81.) When someone did complain, Lt. Green removed the items from his office. Norris focuses also on the racial slur which passed over the radio. (Pl.Dep. at 125.) Again, this single isolated comment was not directed at Norris and was not even made in his presence. (Pl.Dep. at 125.)

3. Oncale claimed that his male co-workers on    an offshore oil rig sexually harassed him.

In fact, Norris cannot identify the speaker of the comment. While he claims that the department did not properly investigate the incident, he admits repeatedly that he did not know what the City did to resolve the issue. (Pl.Dep. at 125.) In uncontradicted fact, the City conducted an extensive investigation of the racial slur made over the airways. (Edison Aff. ¶ 4.) This investigation included extensive resources within the Police Department as well as utilizing the assistance of the FBI, the South Carolina Law Enforcement Division, the County Communication Center Maintenance Shop, Motorola, the United States Attorney for South Carolina, the Tenth Circuit Solicitor, and the Engineering Section of the FBI in Quantico, Virginia. (Eidson Aff. ¶¶ 5–16.) The investigation failed to establish that the person who uttered the slur was even employed by the City.

■ Norris claims that "Lieutenant Green falsely accused [Plaintiff] of insubordination related to his decision not to charge a DUI suspect," and that this supports his hostile environment claim. However, this allegation, even if true, does not support Plaintiff's claim of a racially hostile working environment. Plaintiff admitted in his deposition that Lieutenant Green acted in a self-serving manner when dealing with both African American and Caucasian officers (Pl.Dep. at 79–81) and that whites and blacks had sought to leave Green's shift. (Pl.Dep. at 82–83.) Such actions must logically be based on factors other than race and cannot be used to support a claim for a racially hostile work environment.

Norris also claims that "Lieutenant Terry Mitchell asked Plaintiff to type some notes off of a piece of paper that had a confederate flag hand drawn in one corner." Although the Plaintiff insists that the flag offends him, he admitted that he had not told Lieutenant Mitchell of this belief. (Pl.Dep. at 146.) This allegation is the type of isolated incident which clearly does not rise to the level of a hostile

working environment. *Katz,* 709 F.2d at 256.

■ Plaintiff claims that Officer Jim Williams received a threat with the words "severe, deadly consequences" and that this contributed to a hostile environment. However, it is uncontradicted that the City conducted an extensive investigation into the threat. The investigation failed to establish that the person who made the threat was even employed by the City. The threat was neither made to Plaintiff nor did it reference him or his EEOC claim. "The directly injured persons, rather than bystanders appalled to learn that discrimination is ongoing, are the proper Plaintiffs in situations of this kind." *Bermudez v. TRC Holdings,* 138 F.3d 1176, 1181 (7th Cir.1998). The threat was made to Officer Williams, a Caucasian, not Plaintiff. Plaintiff was a mere bystander to the threat. This threat to Williams is insufficient to support Plaintiff's hostile environment claim.

■ Lt. Eidson testified without contradiction that a "black face" identification card was found in a file cabinet used by Captain McMahan. Uncontradicted evidence was presented that the card was found in the files of an ex-employee who was no longer employed. Thus there was very little remedial action that Defendant could take. There was no indication that the card had been shown to any employee, and in light of such fact an "investigation" involving the publication of the card to department employees might well have done more harm than good. The fact that the Defendant failed to take disciplinary action against an employee who was no longer employed by the department cannot support Plaintiff's hostile work environment claim. Furthermore, Plaintiff has presented no evidence that he or anyone else even had knowledge prior to the filing of this lawsuit of the existence of the card. It was only on July 12, 1999, months after the suit was filed, that Captain Eidson testified to the card's existence. Events of

which Plaintiff had no knowledge cannot support a hostile environment claim, because a person cannot perceive an act as hostile if he is not aware of its existence. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Norris heard a rumor that Deanne Orr, a booking officer, called Officer Bracone a "nigger lover," yet Norris has no personal knowledge of this event. He also heard that Ms. Orr was disciplined for allegedly making this statement. Even though Ms. Orr vehemently denied making such a statement, she was in fact disciplined.

■ Plaintiff also uses a "service revolver" incident to support his claim for hostile environment. It is an uncontradicted fact that the Defendant sent Plaintiffs weapon to the manufacturer for an evaluation. The manufacturer returned the weapon having found no defects whatsoever and determined that the weapon was safe to use. (Eidson Aff., No. 2 ¶ 5.) Furthermore, Plaintiff has presented no evidence that racial animus motivated Green's response to the situation, or that white officers had been treated differently under similar circumstances. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1106 (4th Cir. 1985). Since Plaintiff's allegation contains no racial animus, it cannot be used to support his hostile work environment claim.

Norris' evidence of racial slurs and racially derogatory names amount to nothing more than isolated instances over a period of fourteen years. In the recent case of *Klein v. McGowan*, the United States Court of Appeals for the Eighth Circuit upheld the dismissal of a hostile environment claim that alleged various comments and innuendoes that spanned the plaintiff's sixteen years of employment. 198 F.3d 705, 707 (8th Cir.1999). The facts in *Klein* are strikingly similar to those alleged here. In *Klein*, the plaintiff's supervisor and co-workers made comments such as (1) "If I ever find out you're queer, I'll fire you," (2) "go home and play with yourself," (3) "I'll use Vaseline; [Klein] knows all about that," and (4) "he's a homo ... he's come out of the closet." Klein's supervisor also gave Klein unjustifiably low performance ratings, assigned him menial tasks, and periodically threatened him with dismissal. *Id.* Klein also claimed that he was unfairly disciplined, just as Norris does in this case. As in this case, Klein failed to produce any evidence that the discipline he suffered was connected to any category protected by federal law. Just as in this case, Klein claimed that his superior failed to adequately respond to incidents of harassment created by other employees. As in this case, there is no evidence that Klein ever filed a formal complaint with the human resources department. As in this case, most of the claimed incidents of harassment fell outside the 300–day period established by Title VII. Finally, as in this case, the Eighth Circuit concluded that mere offensive utterances and teasing, offhand comments, and isolated incidents, do not amount to severe and pervasive harassment, particularly when viewed in the social context of a longtime law enforcement officer. As in this case, that court correctly concluded that defendant's motion for summary judgment must be granted.

Furthermore, most of the events that Plaintiff claims created a hostile work environment were not directed at the Plaintiff personally. In *Bermudez v. TRC Holdings*, the plaintiff complained of sexist remarks made to applicants for employment at her place of work. 138 F.3d 1176 (7th Cir.1998). None of these comments were directed against her personally. *Id.* at 1181. The Seventh Circuit rejected the comments against others as a basis of discrimination against the plaintiff and noted that "[t]he directly injured persons, rather than bystanders appalled to learn that discrimination is ongoing, are the proper plaintiffs in situations of this kind." *Id.* at 1181.

■ Also, several of the events Plaintiff claims created a hostile work environment did not involve agents of Defendant

and no basis exists for imputing liability to Defendant. Plaintiff claims that Fire Chief Gilreath's comments created a hostile environment. However, since Gilreath is a member of the fire department, he has no supervisory status or authority over Plaintiff, an officer in the police department. Title VII defines "employer" to include "any agent" of an employer. While the statute does not define "agent," the Fourth Circuit applies agency law principles to determine whether a person acted on behalf of the employer by acting as the employer's agent in the course and scope of the agency relationship. In *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *aff'd in pertinent part*, 900 F.2d 27 (4th Cir.1990), the Fourth Circuit determined that an employer may be held liable if an individual acts as its alter ego by serving in a supervisory position and exercising significant control over plaintiff's hiring, firing or conditions of employment. The power to set work assignments often represents a key element of supervisory authority. *Id.* (citing *Hamilton v. Rodgers*, 791 F.2d 439 (5th Cir.1986)).

▇▇▇ According to the Supreme Court's decisions in *Faragher* and *Ellerth*, the court only imputes liability for harassment to the employer where the actor is an immediate or successively higher supervisor of the plaintiff with the ability to affect plaintiff's terms or conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In the context of a city, a mayor controls all subordinate city employees' conditions of employment. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162 (11th Cir.1993). Below the mayoral (or comparable) level,. however, the official would need to have either direct or successively higher supervisory authority to be deemed the "employer" or "alter ego." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993) (agreeing with the Fourth Circuit's

decision in *Paroline* that an individual may operate as the alter ego of the employer and expose the employer to liability). In *Sauers*, the Tenth Circuit held that the county was liable for the acts of the county attorney who fired a secretary in his office, allegedly in retaliation for her complaints of harassment, because he was "a paradigm example of a supervisor with significant control over plaintiff's hiring, firing, or conditions of employment," with ultimate authority over plaintiff's employment and working conditions. Of course, Gilreath had no such control or supervising authority over Norris.

Norris' evidence amounts to nothing more than isolated comments, many of which were not directed at him, made by a variety of individuals (some of who were not even employed by the City), over a period of fourteen years. Few of these isolated comments were the subject of a timely charge of discrimination. Plaintiff's sole EEOC charge is dated February 28, 1998. (Pl.Dep. at Ex. 2.) The alleged events were neither physically threatening nor humiliating. These events, taken singularly or together, fall far short of the level of severity and pervasiveness required to be actionable. A reasonable person in this social context would not find the isolated instances of which he now complains to have created a hostile or abusive environment. Furthermore, that Plaintiff continues to work for Anderson years after the alleged harassing comments undercuts his argument that the conduct of which he complains actually affected his employment. Viewing the facts in a light most favorable to Plaintiff, his claims simply do not rise to the level of actionable harassment compensable under Title VII and Section 1981.

Even if Plaintiff could establish a *prima facie* case of hostile environment discrimination, Defendant is not liable for such environment because it maintained a harassment policy and exercised reasonable care to prevent and correct promptly any racially harassing behavior. More-

over, Plaintiff unreasonably failed to take advantage of Defendant's preventative and corrective opportunities or to avoid harm otherwise.

■ According to the Supreme Court, when no tangible employment action is taken, an employer can escape liability for sexual harassment by a supervisor if it proves that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton,* 118 S.Ct. 2275 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). This defense has also been applied to racial harassment cases under Title VII. *Booker v. Budget Rent–A–Car Sys.,* 17 F.Supp.2d 735 (M.D.Tenn.1998). While this standard applies to supervisor harassment, a more relaxed standard applies when a non-employee or co-employee conducts the harassment. According to the First Circuit,

> [a]n employer who has taken reasonable steps under the circumstances to correct and/or prevent racial harassment by its nonsupervisory personnel has not violated Title VII.... It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race.

*DeGrace v. Rumsfeld,* 614 F.2d 796, 805 (1st Cir.1980).

Plaintiff failed to report almost all of the alleged incidents that he now claims created a hostile working environment. Of the alleged incidents Plaintiff or some other employee brought to Defendant's attention, Defendant investigated immediately and took prompt corrective measures to remedy the situation and prevent it from re-occurring. This is evidenced by Defendant's extensive investigation into the radio incident and the death threat letter. This is further evidenced by Defendant's swift action against Fire Chief Gilreath for his comments, its discipline of Officer Orr for her alleged comments, Lt. Green's immediate removal of the Confederate flag and Robert E. Lee memorabilia once he was notified that another officer complained, and Defendant's sending of Plaintiff's weapon to the manufacturer for evaluation.

■ The only incidents that Defendant did not immediately investigate were the alleged incidents that Plaintiff did not report to Defendant. Defendant has not taken any tangible employment action against Plaintiff who continues to work for Defendant. In fact, Plaintiff received a promotion sometime after he filed a charge with the EEOC. Therefore, even if Plaintiff had established a *prima facie* case, the evidence inevitably shows that Defendant satisfied the requirements of the affirmative defenses.

## CONCLUSION

For the reasons set forth, it is ORDERED that Defendant's Motion for Summary Judgment be **granted** as to Plaintiff's hostile work environment claim under Title VII and § 1981. The Court adopts the Report and Recommendation of the Magistrate Judge to the extent that it recommends Defendant's motion for summary judgment be **granted** as to all other claims of Plaintiff.

**IT IS SO ORDERED**